**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| **WILLIAM FOX**, individually and on behalf of all others similarly situated, | **Case No.:** 17-cv-80949 DMM/DLB |
| **Plaintiff** | **JURY TRIAL DEMANDED** |
| v. | **Assigned to: Donald M. Middlebrooks** |
| **FIRST  DATA  MERCHANT  SERVICES, LLC** | |
| **Defendant** | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## I.        INTRODUCTION

This is a textbook case for class certification. First Data Merchant Services LLC, and its department First Data Global Leasing (hereinafter referred to as "First Data" or "Defendant"), itself and through its agents the Independent Sales Organizations (ISOs), through material omissions and/or the promise of savings, induced Plaintiff and Classes into an unconscionable lease where the costs of the lease ($5,760.00 to $7,000.00) was disproportionate to the $350.00[1] value of the leased point-of-sale terminal, a Pin Pad 1000 SE ("Equipment"). First Data then overcharged them for sham insurance for the Equipment that Plaintiff and Classes never agree to when they originally entered into the lease with First Data, and as well First Data put into the fine print of the equipment lease an accelerated remaining payment termination fee (Exh. G, Program Guide at 44) if Plaintiff or Class member ever decided to get out of the lease, and this termination fee could be in excess of $5,000.00-to-$7,000.00. In fact, certain class members - who have tried

---

[1] The point-of-sale terminal is a Pin Pad 1000 SE. Exh. A, Depo of Edward Quaranta at 63:4-7.  *See, e.g.*, Pin Pad 1000 SE's have a list price of $139.00.  *See, e.g.*,
http://www.merchantservice.com/shop/pc/viewPrd.asp?idproduct=78 (Last Visited 11/30/2017).

to get out of the equipment lease with First Data - have been sued individually by Defendant for the remaining balance on the lease. *Paymentech, LP d/b/a First Data Merchant Services v. Jody Presley*, Case No. 16PO-CC0001 (Missouri).

This is the same as what happened to Plaintiff. First Data's ISO solicited him with the promise of savings and the next thing he knew after signing his name to the Merchant Processing Application and Agreement ("MPA") and Confirmation Page on January 8, 2015, he was stuck with the equipment lease that if he wanted to get out of on that day he would have owed First Data $5,700 for a piece of equipment that he could have purchased outright for between $175 and $350 at office supply stores like Office Depot and Staples, and numerous online retailers.

In response to Defendant's unlawful conduct, in an effort to ensure that Defendant does not continue this conduct in the future, and because he could not afford the accelerated payment termination fee and did not want to be sued by Defendant, Plaintiff brought this putative class action. Plaintiff seeks an order from the Court certifying a proposed Class and Subclass (hereinafter collectively referred to as "Classes") of individuals who were subject to Defendant's wrongdoing.

As discussed below, the proposed Classes meet each of the requisites for class certification under Fed. R. Civ. P. 23 and therefore, the instant motion should be granted in its entirety.

## II.    FACTUAL BACKGROUND

**A.    Defendant First Data's Conduct in regard to its Equipment Lease with Plaintiff and Classes is Uniform and, therefore, Plaintiff's Claims against First Data are Susceptible to "Generalized Proof."**

### 1.    First Data, Not the ISO, Is the Party to the Lease.

Though First Data uses different ISOs, like Securus, as agents to obtain the lease, First Data - and not the ISO - is the party to the lease. Plaintiff has "generalized proof" to support Plaintiff's claim that First Data is a party to the lease with Plaintiff and Classes and is, therefore, liable for their damages.

Indeed, Merchant Processing Application and Agreement ("MPA"), Exh. B at 2, which provides:

"LEASE COMPANY: (04) **First Data Global Leasing** Lease Term: [NUMBER] Mos. Annual Tax Handling Fee: 10.20 Total Monthly Lease Charge: $[NUMBER] w/o taxes, late fees, or other charges that may apply – See Lease Agreement in Program Guide for details. This is a non-cancellable lease for the full term indicated.

*Id.* (Emphasis added.)

In fact, First Data Global Leasing, being a party to the lease for the Equipment, likewise appears in First Data's form MPA.[2]

Similarly, the Merchant Services Program Guide ("Program Guide"), containing the so-called "Third Party Agreements," which includes the "Equipment Lease Agreement," provides:

"This Equipment Lease Agreement ("Lease Agreement") is being entered into by and between First Data Merchant Services Corporation (through its business unit ***First Data Global Leasing***), and the Lessee identified on the signature panel of this Merchant Processing Application ("MPA"). In this Lease Agreement, the words 'we,' 'our' and 'us' refer to First Data Merchant Services Corporation and its successors and assigns and the words "you" and "your" refer to Lessee and its permitted successors and assigns."

Exh. G. (Emphasis added.) In fact, First Data Global Leasing being a party to the Equipment Lease Agreement "Lease Agreement," also appears in First Data's form Program Guide.[3]

Indeed, in the Welcome Packet / Welcome Letter, First Data writes:

"Dear WILLIAM FOX:

We are pleased to welcome you as a **First Data Global Leasing (FDGL)** customer. Your equipment on the lease referenced above has been referred from FDMS ISO to FDGL, a business unit of First Data Merchant Services. Your lease payments will automatically transfer from your checking account #[REDACTED] on day 1 of each month, and FDGL

---

[2] *See also*, Exh. C, MPA bearing Data Genesis stamp FD1C-0019428-19431; Exh. D, MPA bearing Mega M stamp at FD1C-0113027-FD1C-0113031 at FD1C-0113027 (substantially the same language); Exh. E, MPA bearing BanCard Systems stamp at FD1C-0105571-FD1C-0105576 at FD1C-0105571 (substantially the same language); and Exh. F, MPA bearing West Coast Merchant Services stamp at FD1C-0125856-FD1C-0125861 at FD1C-0125857 (substantially the same language).

[3] *See also*, Exh. H, Program Guide bearing Data Genesis Stamp, FD1C-0019432-0019473 at FD1C-0019461 (Same language); Exh. I, Program Guide bearing BanCard Systems Stamp, FD1C-0105577-FD1C-0105631 at FD1C-0105623 (same language); Exh. J, Program Guide bearing West Coast Merchant Services, FD1C-0125862-FD1C-0125925 at FD1C-0125896 (same language); Exh. K, Program Guide bearing Mega M stamp, FD1C-0113032-FD1C-0113073 at FD1C-0113054 (same language).

will be indicated on your checking account statement."

Exh. C Def's Mtn. to Dismiss ("PMTD") at 1 (Dkt. 26-3), dated 1/14/2015. (emphasis added)

This of course does not make any sense because the leasing agreement contained in the Program Guide that William Fox was given on or about January 8, 2015 already indicated that First Data Global Leasing is the party to the lease, so it is unclear what FDMS ISO had to transfer. Also, on the confirmation page of the MPA, the party indicated as the processor is First Data Merchant Services (*Id*. at 8), which First Data describes as "FDMS ISO." Since First Data owns both FDMS ISO and FDGL, to the extent there was an assignment in William Fox's case, at all times First Data owned the lease. In any case, one thing is clear, the party to the lease at all times is: First Data, not Securus.

**2.     First Data Trains and Controls the ISOs.**

First Data Global Leasing (FDGL) uses ISOs to sell leases for the Equipment, which FDGL is the leaseholder. At all times, First Data controls the ISOs as evidenced by its ISO training. *See* Exh. L, ISO Training First Data Global Leasing Power Point ("ISO Training"), FD1C0127263- FD1C0127281. First Data created the process by which a person is signed up and trains the ISOs to implement that process. *See id*.

In the ISO Training, First Data educates its ISO that First Data provides "innovate, cost- effective solutions for leasing of POS equipment since 1999" (*id*. at FD1C-0127265) and that "the benefits to signing an equipment lease agreement from the merchant's perspective" is "Conserving Capital" (*id*. at FD1C-0127275). So, for example, the mention by Securus of "savings" and lowest rates came from its training by First Data to be used in selling leases. *See, id*. at FD1C-0127275- FD1C-0127277.

First Data admits that it has the power to control its ISOs. In describing who First Data is and what First Data offers, First Data states "it **holds** itself and **its business partners to the highest ethical standards**, both internally and externally." *See, id*. at FD1C-0127265 (emphasis added).

**3.     First Data Uses Substantially Similar Documents and a Uniform Process for Its Equipment Leases with Plaintiff and Class.**

Though different ISOs are used as agents to obtain the leases for the principal - First Data, First Data uses substantially similar form contracts, leases, and welcome documents and a uniform process for its equipment leases with Plaintiff and Class.

As an initial matter, First Data creates the process and the forms an ISO uses. *See*, Exh. L, ISO Training. First Data claims "Why partner with us? Our unique streamlined process allows your clients to sign for processing services and leasing using one form." *Id*. at FD1C-0127268.

Indeed, the substantially similar documents that First Data uses are as follows: The Merchant Processing Application and Agreement ("MPA"), which incorporate by reference the Merchant Services Program Guide, including the embedded lease (Exh. B at 1 and 7), the Merchant Services Program Guide containing the full terms of the embedded lease (Exh. G at 44), the Equipment Lease Agreement (contained within Exh. G and Exh. C to PMTD (Dkt. No. 26-3), and the First Data Welcome Letter with attached lease and insurance document (*id*.). *See also* Exh. L, ISO Training, FD1C-0127263-FD1C-0127281. As indicated in fns. 2 and 3, First Data and its ISOs uses substantially similar forms. In fact, Plaintiff has found that three different ISOs have used the same or substantially the same three main documents. *See* West Coast Merchant Services', Mega M's, Data Genesis', and BanCard Systems' MPAs identified in footnote 2 *infra*. See West Coast Merchant Services', Mega M's, Data Genesis', and BanCard Systems' Program Guides identified in footnote 3 *infra*; *see, also*, the Equipment Lease Agreements embedded within those documents.

Regardless of which ISOs are used, Plaintiff and Classes are signed up in the same uniform way using substantially similar documents. A potential customer signs the MPA (*See* Exh. B and, by way of example, MPA's identified in fn. 2) which includes a non-cancellable lease, incorporates by reference the multipage Program Guide which includes a non-cancellable lease, and is purportedly given the Program Guide containing an embedded lease (Exh. G and, by way of example, Program Guides identified in fn 3). The lease is non-cancellable at the time the person signs his name to the MPA. *See* MPA at Exh. B and, by way of example, MPAs identified in footnote 2). Some days or a week later, First Data sends the Welcoming Letter with attached lease and insurance document. *See*, Exh. C to PMTD (Dkt. 26-3) and Exh. L, ISO Training at FD1C-

0127263-FD1C-0127281). The customer's signature page on the Program Guide also serves as a signature page to the Equipment Lease Agreement and the TeleCheck Services Agreement appearing in the Third Party Section of the Program Guide. Exh. G at 2). *See also* Exh. L, ISO Training, at FD1C-0127277- FD1C-0127303, setting forth the form process.

To illustrate First Data's uniform process, these identified documents - the MPA, the Program Guide, and the Welcoming Letter containing the insurance information and the terms and conditions of the equipment lease -- all reference each other's form language, which demonstrates that these documents are meant to be used in a uniform way. For example, the Welcoming Letter indicates: "[t[he Terms and Conditions of your lease agreement are enclosed with this letter. They can also be found in the equipment lease agreement section of the Program Guide provided to you by FDMS ISO." Exh. C to PMTD at 1.

Accordingly, since First Data itself and through its department and ISOs uses substantially similar documents in a uniform way in entering into equipment leases with Plaintiff and Classes, First Data's wrongdoing that Plaintiff is challenging is subject to "generalized proof" that allows Plaintiff's Classes to be certified for the reasons stated herein.

## III. THIS COURT SHOULD CERTIFY PLAINTIFF'S PROPOSED CLASSES BECAUSE THEY MEET EACH OF THE REQUISITES FOR CLASS CERTIFICATION UNDER FED. R. CIV. P. 23.

### A. Choice of Law

Plaintiff contends that New York law governs this action. The Program Guide has a choice of law provision that states:

> **Choice of Law.** Our Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to its choice of law provisions)."

Exh. G at 40.[4]

Furthermore, the Equipment Lease Agreement states:

---

[4] See also, Program Guide bearing Data Genesis Stamp, FD1C-0019432-0019473 at FD1C-0019458 (Same language); Program Guide bearing BanCard Systems Stamp, FD1C-0105577-FD1C-0105631 at FD1C-0105620 (same language); Program Guide bearing West Coast Merchant Services, FD1C-0125862-FD1C-0125925 at FD1C-0125892 (same language); Program Guide bearing Mega M stamp, FD1C-0113032-FD1C-0113073 at FD1C-0113052 (same language).

"This Agreement shall be governed by and will be construed in accordance with the laws of the State of New York (without applying its conflict of laws principles)."

Exh. C to PMTD (Dkt. 26-3) at 2.

Also, the Program Guide identifies the Processor as: First Data Merchant Services and identifies 1307 Walt Whitman Rd., Melville, NY 11747 as the address to which to send notice. *See* Exh. G at page 52.[5] Defendant also has admitted that New York law applies to this case as it argued for it in its application in its Partial Motion to Dismiss Plaintiff's Amended Complaint. *See,* PMTD Dkt. No. 26 fn. 3 at 4.

For the foregoing reasons, New York law is the governing law for Plaintiff's class action.

**B.         The Proposed Class**

As a result of Defendant's conduct described above, Plaintiff brought the instant lawsuit and now seeks certification of the Classes pursuant to Rule 23(a)(b)(2), (b)(3) and (c)(4) of the Federal Rules of Civil Procedure. The Class is defined as follows:

> All persons and entities in the United States who paid First Data (a) a lease fee for credit card processing equipment and/or (b) the purported insurance fee.

The Sub-Class is defined as:

> All persons and entities in Texas who paid First Data (a) a lease fee for credit card processing equipment and/or (b) the purported insurance fee.

As demonstrated below, the Classes meet each of Rule 23's requisites to certification and therefore, the instant motion should be granted in its entirety.

**C.         The Proposed Class Meets Each Of The Requirements For Class Certification.**

Class certification is appropriate under Rule 23 when the proponent of certification demonstrates that each of the requirements of Rule 23(a) and at least one of the subsections under Rule 23(b) have been satisfied. Fed. R. Civ. P. 23; *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004), *abrogated on other grounds* by *Bridge v. Phoenix Bond & Indemnity Co*., 553

---

[5] See also, Program Guide bearing Data Genesis Stamp, FD1C-0019432-0019473 at FD1C-0019464 (same); Program Guide bearing BanCard Systems Stamp, FD1C-0105577-FD1C-0105631 at FD1C-0105631 (same); Program Guide bearing West Coast Merchant Services, FD1C-0125862-FD1C-0125925 at FD1C-0125924 (same language); Program Guide bearing Mega M stamp, FD1C-0113032-FD1C-0113073 at FD1C-0113071 (same language).

U.S. 639 (2008). Rule 23(a) requires (i) the proposed class to be so numerous that joinder of all individual class members is impracticable (numerosity); (ii) that there are common questions of law and fact among the class members (commonality); (iii) that the named representative's claims are typical of those of the class (typicality); and, (iv) that both the named representative and his counsel possess the ability to adequately represent the interests of the class (adequacy). Fed. R. Civ. P. 23(a); *see Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1189-90 (11th Cir. 2009).

Here, Plaintiff seeks certification of the proposed Classes under both Rule 23(b)(2) and 23(b)(3). In order to certify a class under Rule 23(b)(3), a plaintiff must show (i) that questions of law or fact common to the proposed class members predominate over questions affecting only individual members, and (ii) that the class mechanism is a superior method for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3); *Klay*, 382 F.3d at 1251. Similarly, in order to certify a class under Rule 23(b)(2), a plaintiff must show that the party opposing certification has acted or failed to act on grounds generally applicable to the class as a whole, "so that final injunctive relief or corresponding declaratory relief is appropriate...." Fed. R. Civ. P. 23(b)(2); *see also Heffner v. Blue Cross & Blue Shield of Alabama, Inc.*, 443 F.3d 1330, 1344 (11th Cir. 2006).

In determining whether to certify a proposed class, a court does not inquire into the merits of the plaintiff's claims. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 (1974). A court should only consider "the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Babineau,* 576 F.3d at 1190. Indeed, courts are required to analyze the allegations of the complaint and any evidence submitted by the parties, with a presumption in favor of certification. *Id*.

**D.    The Proposed Class Is Adequately Defined and Ascertainable.**

"Before establishing the explicit requirements of Rule 23(a), a plaintiff must first establish that the proposed Class is 'adequately defined and clearly ascertainable.'" *Randolph,* 303 F.R.D. at 684. This "ascertainability" requirement asks (i) whether members of the proposed class "can be ascertained by reference to objective material," and (ii) whether analysis of that objective

criteria is "administratively feasible," such that "identifying class members [would be] a manageable process that does not require much, if any, individual inquiry." *Bussey v. Macon Cty. Greyhound Park, Inc.,* 562 F. App'x 782, 787 (11th Cir. 2014).

This class definition uses only objective criteria and so is "adequately defined." First Data admitted that there is a database (Exh. A, 46:13-16) which lists all the persons and entities who have a lease for the Equipment with First Data, and the database reflects the specific charges that First Data customers were charged. *Id.* Accordingly, it is also "clearly ascertainable," as class members can be identified through the database that they have the lease for the equipment with First Data and that they were charged for the purported insurance fee. More importantly as First Data is currently charging most of the Class through automatic debit on a monthly basis for the monthly lease charge and the fee for the purported insurance, Plaintiff does that even anticipate that Defendant will challenge the ascertainability of the Class. *Compare Karhu v. VitalPharm., Inc,* No. 1360768-CIV, 2014 WL 815253, at *3 (S.D. Fla. Mar. 3, 2014) (class of consumers who made "a relatively small purchase compared with, for example, a car or a major appliance" was not ascertainable), *with Sanchez-Knutson,* 310 F.R.D. at 542 (ascertainability requirement met for a class of Florida consumers who purchased or leased a 2011-2015 Ford Explorer from authorized Ford dealers in Florida).

### E.     The Proposed Classes Satisfies Rule 23(a).

### 1.     Rule 23(a)(1) - Numerosity

The first requirement of Rule 23(a) is met when "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1); *see also, Fabricant v. Sears Roebuck, et al.*, 202 F.R.D. 310, 313 (S.D. Fla. 2010) (finding that Rule 23(a) requires that joinder be impracticable, not impossible). To satisfy this requirement, there is no "definite standard as to the size of a given class, and plaintiff's estimate need only be reasonable." *Id.* (citing *Kilgo v. Bowman Transp. Inc.*, 789 F.2d 711, 718 (11th Cir. 1984)). Courts are permitted to "accept common sense assumptions" about the numerosity requirement. *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 205 (E.D. Pa. 2001), *aff'd* 305 F.3d 145 (3rd Cir. 2002). Generally, the numerosity

requirement is met if the class has 40 or more members. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Given Defendant's large size, and that First Data has admitted that it "has funded in excess of 1.4 million leases" (Exh. L, ISO Training, at FD1C-127265) and applying "common sense assumptions," it is manifestly reasonable to estimate that the classes contain thousands of consumers, if not more. Accordingly, the proposed Class meets the numerosity requirement.

As it is not feasible to individually join each of these First Data consumers, the proposed classes satisfy Rule 23(a)(1)'s numerosity requirement.

**2.      The Class Meets the Rule 23(a)(2) Commonality Requirement.**

Next, Rule 23(a) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To meet the commonality requirement, the representative plaintiff is required to demonstrate that the proposed class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). In other words, commonality requires that the claims of the class members "depend upon a common contention…of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

"The threshold for commonality is not high." *In re Recoton Corp*, 248 F.R.D. 606, 618 (M.D. Fla. 2006) (*quoting Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003)). Rather, the requirement is met where there is "at least one issue affecting all or a significant number of proposed class members." *Fabricant,* 202 F.R.D. at 313.

The claims of Plaintiff and the putative Class members are based on the common contention that Defendant First Data, itself and through its ISOs, through material omissions and/or the promise of savings, induced Plaintiff and Classes into an unconscionable lease where the costs of the lease ($5,760.00 to $7,000.00) was disproportionate to the $350.00 value of the underlying equipment leased, then overcharged them for sham insurance that they never agree to when they originally entered into the lease with First Data, and put into the unconscionable lease

an accelerated remaining payment termination fee if Plaintiff or class member ever decided to get out of the lease (*See*, Exh. G, Program Guide at 44), and this termination fee could be in excess of $5,000.00.

Any one of these common contentions alone meets the requirement of Rule 23(b)(2). Plaintiff also incorporates by reference Section (III)(F)(2), where Plaintiff demonstrates that the Classes meet the more demanding Rule 23(b)(3) predominance requirement. Accordingly, Plaintiff and the proposed Classes easily meet the low-threshold requirements of commonality.

**3.      Plaintiff's Claims are Typical of the Class Members' Claims – Rule 23(a)(3)**

The typicality element of Rule 23 simply requires that Plaintiff's claims be typical of those of the other class members. Fed. R. Civ. P. 23(a)(3). "[T]ypicality measures whether a significant nexus exists between the claims of the named representative and those of the class at large." *Hines v. Widnall,* 334 F.3d 1253, 1256 (11th Cir. 2003) (internal quotation omitted). In general, "[t]he claim of a class representative is typical if 'the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Williams v. Mohawk Indus., Inc.,* 568 F.3d 1350, 1357 (11th Cir. 2009). The purpose of the typicality requirement is to ensure that "the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). Thus, the typicality requirement is met where, in proving his own case, "the representative plaintiff [also] establishes the elements needed to prove the class members' case…." *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 683 (S.D. Fla. 2008).

Plaintiff easily meets this requirement because both he and the proposed Classes were subject to Defendant's common course of conduct as described herein. As a result of that conduct, Plaintiff and the other class members are entitled to damages and injunctive relief. As such, by pursuing his own claims, Plaintiff will necessarily advance the class members' interests, thus satisfying Rule 23(a)(3)'s typicality requirement.

**4.   Both Classes Meet the Rule 23(a)(4) Adequacy of Representation Requirement.**

Finally, Rule 23(a) requires that the representative parties have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "adequacy-of-representation requirement encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW Realty, Inc.,* 513 F.3d 1314, 1323 (11th Cir. 2008). "Adequacy of representation is presumed unless there is evidence to the contrary." *Brown v. SCI Funeral Servs. of Florida, Inc,* 212 F.R.D. 602, 605 (S.D. Fla. 2003).

Plaintiff has no interests antagonistic to those of the Class members. To the contrary, Plaintiff's interests are aligned—Plaintiff and the rest of the proposed class will all benefit if Plaintiff successfully proves that Defendant breached the contract, breached the covenant of good faith and fair dealing, violated N.Y. Gen. Bus. Law § 349, or unjustly enriched itself by the wrongdoing described herein. Plaintiff has shown through Plaintiff's conduct to date that Plaintiff is motivated to obtain monetary relief for all class members. Additionally, Plaintiff has retained counsel experienced in prosecuting consumer protection class actions *(see* Exh. M and N to Yanchunis Decl. (firm résumés), Exh. 1; opposed Defendant's Partial Motion to Dismiss the case (Dkt. No.26); uncovered key internal documents through discovery that have advanced the class's claims against Defendant; deposed a 30(b)(6) corporate representative of Defendant in preparation for trial. At this stage of the litigation, there should be no reason to doubt that Plaintiff is an adequate representative for the class and will continue protecting class members' interests at trial.

Likewise, Plaintiff's counsel are well-respected members of the legal community who have extensive experience in the area of consumer protection class actions. Moreover, counsel has litigated multiple cases nationally (in several federal district courts) involving consumer protection class actions and has the resources necessary to conduct this type of litigation. *See id*.

**F.   The Proposed Class Satisfies Rule 23(b).**

Once the prerequisites of Rule 23(a) are satisfied, one of the three subsections of Rule 23(b) must be satisfied. Here, Plaintiff seeks certification of the proposed Classes under Rule 23(b)(2) and (b)(3).

1.      **Rule 23(b)(2)**

Rule 23(b)(2) provides that the party opposing certification must have acted or failed to act on grounds generally applicable to the proposed class, "so that final injunctive relief or corresponding declaratory relief is appropriate...." Fed. R. Civ. P. 23(b)(2); *see also Heffner v. Blue Cross & Blue Shield of Alabama, Inc.,* 443 F.3d 1330, 1344 (11th Cir. 2006). "The requirement that the defendant act on grounds generally applicable to the 23(b)(2) class is encompassed in the commonality requirement of Rule 23(a)." *Diaz v. Hillsborough County Hosp. Auth.*, 165 F.R.D. 689, 695 (M.D. Fla. 1996). Thus, where a court finds that Rule 23(a)'s commonality requirement is met, the court should typically also find that the plaintiff has sufficiently shown that the defendant acted on grounds generally applicable to the class as a whole. *Id.*

There should be no question that Defendant acted on grounds generally applicable to both the Classes for the reasons stated herein. Defendant's conduct did not vary significantly from class member to class member and final injunctive relief is necessary to protect Plaintiff and the Class from such conduct in the future. Thus, the requirements of Rule 23(b)(2) are met.

2.      **Common Question of Law and/or Fact Predominate within the meaning of 23(b)(3).**

Plaintiff also seeks certification of both the Classes under Rule 23(b)(3). To certify a class under Rule 23(b)(3), the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). When considering the element of predominance, "[i]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." *Klay*, 382 F.3d at 1254. The "inquiry into whether common questions predominate over individual questions is generally focused on whether there are common liability issues which may be resolved efficiently on a class-wide basis." *Agan v. Kathzamn & Korr, P.A.*, 222 F.R.D. 692, 700 (S.D. Fla. 2004); *see Dukes*, 131 S. Ct. at 2551-57. Thus, "[c]ommon issues of fact and law" predominate if they "ha[ve] a direct impact on every class member's effort to

establish liability and on every class member's entitlement to injunctive and monetary relief."

*Klay*, 382 F.3d at 1255.

Thus, the predominance inquiry "begins, of course with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S.Ct. 2179, 2184 (2011). Plaintiffs are not required to prove every element of their claims are susceptible to class-wide proof. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1196 (2013). Rather, the Court should assess each element and determine whether those issues that are subject to "generalized proof," and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof. *Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir. 2000); *see also Klay v. Humana, Inc.,* 382 F.3d 1241, 1264 (11th Cir. 2004) ("[W]hen there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, ... the predominance test will be met.") (quoting *In re Terazosin Hydrochloride,* 220 F.R.D. 672, 694 (S.D. Fla. 2004)).

### a. Plaintiff's N.Y. Gen. Bus. Law § 349 Claim is Subject to "Generalized Proof."

Section 349 of New York's General Business Law ("GBL") prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York State. N.Y. Gen. Bus. Law § 349(a). Section 349 of New York's General Business Law ("GBL"). "To maintain a cause of action under [Section] 349, a plaintiff must show: (1) that the defendant's conduct is 'consumer-oriented'[6]; (2) that the defendant is engaged in a 'deceptive act or practice'; and (3) that the plaintiff was injured by this practice." *Wilson v. Nw. Mut. Ins. Co.,* 625 F.3d 54, 64 (2d Cir. 2010) (citations omitted). A defendant's failure to disclose material

---

[6] Any person who has been injured by any violation of § 349 or § 350 may also bring a private action in his own name. N.Y. GBL § 349(h) and N.Y. GBL § 350-e. – "Person" has been interpreted to include corporate competitors if there is "some harm to the public at large" and competitor can prove injury. *City of New York v. Smokes-Spirits.Com, Inc.,* 12 N.Y.3d 616, 624 n.3 (N.Y. 2009); *see also Boule v. Hutton,* 328 F.3d 84, 94 (2d Cir. 2003). A large sophisticated corporation like First Data entrapping small businesses like those owned by William Fox into unconscionable leases as described herein constitutes "some harm to the public at large." Also, William Fox entered into a lease with First Data through his business, but First Data required him to personally guarantee the lease in his individual capacity as a person. *See* Exh. B, MPA at 4. Also, when First Data looks to sue its customers for breach of the equipment lease it sues them in their individual capacity. *See, e.g.*, *Paymentech, LP d/b/a First Data Merchant Services v. Jody Presley,* Case No. 16PO-CC0001 (Missouri).

information to consumers is actionable under Section 349. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 647 N.E.2d 741, 745 (N.Y. 1995)). The New York Court of Appeals has established an "objective standard for determining whether acts or practices are materially deceptive or misleading 'to a reasonable consumer acting reasonably under the circumstances.'" *Id.*; *See also, Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (holding because "an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably," a plaintiff "need not show actual reliance on the representation or omission at issue" as to a UDAP claim).

> **b.  Plaintiff GL 349 Claims Regarding Defendant's Sham Insurance are Subject to Generalized Proof.**

Defendant unfairly and deceptively charged Plaintiff and Classes for sham equipment insurance.

As explained *supra*, by the time Plaintiff and Classes received the Program Guide, Plaintiff and Classes are subject to a binding lease with First Data. Subsequently, in the Welcome Letter, Plaintiff and Classes learned about the particulars of this purported insurance:

> **<u>Insurance. Per the terms of your lease agreement you are required to insure the equipment covered by the lease.</u>**
>
> **FDGL offers <u>coverage</u> <u>for you</u> starting as low as $4.95 a month, fixed for the term of your lease. Simply sign the attached verification form and return it to us by mail to First Data Global Leasing, 4000 Coral Ridge Drive, Coral Springs, FL 33065, via fax at 402-916-6860, or via email to <u>*FDGLInsurance@firstdata.com*</u>.**

Exh. C to PMTD at 1 (Emphasis added.) *See also*, ISO Training at FD1C-0127286. (same).

The following representations by First Data leaves Plaintiff and Classes with one clear conclusion: they need to have insurance for their Equipment. But this makes no sense. By the third month, Plaintiff has already paid for the value of the Equipment (three payments times 120 exceeds the estimated value of $350.00), so why does anyone actually need insurance? Also, to the extent there is purported insurance, the insurance is illusory because the exceptions for

coverage are far greater than when the coverage applies.[7]

Whether Defendant wants to call it insurance or an Equipment Protection Program, it is a sham insurance providing illusory coverage. This charge is nothing more than profit to First Data because again there is no need to insure the Equipment that is entirely paid off within the third month of the three-year lease. Also, Plaintiff contends this charge is unfairly and/or deceptively labeled as insurance when it clearly is not insurance, a fact that Defendant concedes in fine print.

Whether Defendant agrees or disagrees with the merits of Plaintiff's deceptive trade practice claim for this sham insurance charge pursuant to GL 349, the form language and the form documents used for this purported insurance and the fact that it is mislabeled as insurance is the generalized proof that will either prove or disprove Plaintiff and Classes' GL 349 claim.

### c. GL 349 Material Omission/Misrepresentation, inducing Plaintiff and Classes into unconscionable lease

First Data itself, and through FDMS ISO as well as other ISO agents, materially omitted to tell Plaintiff and Classes that the point-of-sale terminal ("Equipment") that it was leasing from anywhere from $5,760.00 to $7,000.00 only has a value of $350.00. First Data itself, and through FDMS ISO as well as other ISO agents, make no mention of the disproportionate cost of the lease as compared with the value of the underlying Equipment, but instead stresses deceptively the savings that First Data would provide to Plaintiff and the Class. *See e.g.,* Exh. O ("You will have the lowest rates in the industry.") *See also*, ISO Training ("the most attractive benefit of leasing is often the cash flow advantages it can provide through lower monthly cost.")

This material omission is subject to "generalized proof" because it is omitted from the MPA, the Program Guide, and Welcoming Letter as described herein. While First Data's left hand

---

[7] The Equipment Protection Program protects against losses due to: Burglary, Theft & Robbery, Vandalism, Fire Wind, Hurricane & Tornado, Lightning & Power Surge, Employee Theft, Accidental Damage, Flood and Water, but the Program does not cover loss caused by our resulting from: 1. Loss of market, business interruption, or any other consequential or indirect loss; 2. Mechanical breakdown and maintenance, wear and tear, inherent vice, latent defect. 3. Earthquake and earth movement. 4. Rust, corrosion, marring, and scratching; wet or dry rot, freezing, heating; 5. Shortage of equipment that is discovered upon taking inventory; 6. Abandonment.; 7. Dishonest or criminal acts (including misappropriation, conversion, and skip) by shareholders, directors, owners or partners; 8. War, governmental action, nuclear reaction, radiation, or radioactive contamination. 9. Contaminants or pollutants. (Additional perils not covered and definitions are described in the policy).

(through its FDMS ISO as well as other ISO agents) promises savings, First Data's right hand is locking you in to an unconscionable lease worth up to $7,000.00 grand to lease, which is grossly disproportionate to the $300.00 value of the underlying leased equipment.

### d.  Termination fee GL 349

Though First Data claims there is not a termination fee, the lease clearly states that if Plaintiff "fails to pay" amount due or "default in any material respect," First Data will "accelerate and declare immediately due and payable all monthly lease charges for the remainder of the applicable lease period together with the fair market value of the Equipment (as determined by us), not as a penalty but as liquidated damages for our loss of the bargain." Exh. G, Program Guide at Page 45. In fact, First Data, or its ISOs, has sued its customers because of some default and accelerate the amount due as a termination fee. *See, e.g.*, *Ha Thi Le, et al. v. Lease Financial Group LLC, First Data Global Leasing, First Data Merchant Services, et al.* 2:16-cv-14867-LMA-KWR, Dkt. 47 ("Citing to a press release[8] issued by the New York Attorney General's office, the plaintiffs claim that the defendants have filed more than 30,000 such collection actions in New York between 2010 and 2015, obtaining more than 19,000 default judgments.")
So, when William Fox signed the MPA on January 8, 2015, if he decided soon thereafter to exit the leasing program with First Data, he would have been subject to a termination fee in excess of $5,000.00. Plaintiff contends that this termination fee is a deceptive trade practice that keeps Plaintiff and Classes in the onerous lease with First Data.

For the foregoing reasons, Plaintiff's claims pursuant to GL 349 are subject to "generalized proof," and therefore, Plaintiff's claims meet the predominance requirement of 23(b)(3).

### e.  Plaintiff's other claims are also susceptible to "generalized proof."

Plaintiff also seeks certification for its other claims: (1) breach of contract; (2) breach of duty of good faith and fair dealing, (3) in the alternative to the contract claims, unjust enrichment; and (4) unconscionability. As to facts regarding First Data's sham insurance set out *supra*, when

---

[8] *See also*, https://ag.ny.gov/press-release/ag-schneiderman-sues-northern-leasing-systems-inc-deceptive-business-practices-and. (Last visited 11/30/2017.)

Plaintiff entered into a contract with First Data on January 8, 2015, there was no mention of the specific insurance charge, yet Plaintiff was subsequently charged for this purported insurance, which would constitute a breach of the lease contract. To the extent the Court determines that Plaintiff did agree to pay for the insurance, Plaintiff alleges that Defendant breached the duty of good faith and fair dealing in the following ways: (a) by making a profit on the purported insurance fee that it charged; (b) by not obtaining a cheaper insurance or a cheaper lease for Plaintiff and the Class Members; and (c) by force-placing unnecessary and excessively-priced insurance on Plaintiffs' equipment for profit. (Am. Complaint ¶¶62-67). In the alternative, if the insurance charged is deemed to be outside the scope of Plaintiff's lease with First Data for the Equipment, First Data was unjustly enriched by wrongfully debiting money out of Plaintiff and Classes' accounts for this sham insurance that provides illusory coverage.

Finally, Plaintiff brings a claim of unconscionability against First Data based on the facts that First Data "contracts contain unconscionable provisions, including long-term leases that require the small business owner to pay wildly inflated monthly rental fees for credit card processing terminals and inflated early termination fees, and require the small business owners to personally guarantee the agreement" and that "[t]he agreement also authorizes Defendant to debit all payments purportedly due under the agreement, as of the date of signing or as added by Defendant at any time, directly from Plaintiff's and the classes' respective bank accounts." (Am. Complaint ¶19). Plaintiff also contends that the charge for Defendant's sham insurance is also unconscionable for the reasons stated herein.

As explained more fully herein, because First Data uses substantially similar forms with form language, Plaintiff's claims for (1) breach of contract; (2) breach of duty of good faith and fair dealing; and in the alternative to the contract claims, (3) unjust enrichment; and (4) unconscionability are susceptible to "generalized proof," and, therefore, Plaintiff's claims meet the "predominance" requirement of 23(b)(3).

### 3.    Rule 23(b)(3) - Superiority

The second prong of Rule 23(b)(3) requires the Court to determine whether "a class action

is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The inquiry into whether the class action is the superior method for a particular case focuses on 'increased efficiency.'" *Agan*, 222 F.R.D. at 700 (*quoting Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1359 (11th Cir. 2002)). Class actions are particularly appropriate where, as here, "it is necessary to permit the plaintiffs to pool claims which would be uneconomical to litigate individually." *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 700 (internal citations omitted); *Amchem Prods., Inc., et al. v. Windsor*, 521 U.S. 591, 615 (1997) (stating that the "very core of the class action mechanism is to overcome the problem that small recoveries do not provide an incentive for any individual to bring a solo action prosecuting his or her rights"). The superiority inquiry focuses "'on the efficiency and economy elements of the class action so that cases allowed under [Rule 23(b) (3)] are those that can be adjudicated most profitably on a representative basis.'" *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (*quoting* 7A CHARLES ALANWRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1780 at 562 (2d ed. 1986)). A district court has "broad discretion" in determining whether class treatment is superior. *Kamm v. Cal. City Dev. Co.,* 509 F.2d 205, 210 (9th Cir.1975).

Here, as in *Sanchez-Knutson v. Ford,* a class action is the superior method for adjudicating Plaintiff and Classes' claims against First Data associated with the deceptive trade practices and wrongdoing involving First Data's leases of the equipment. First, the number of class members "is too large for the prosecution of separate actions by each class member to be likely, practical, or desirable." *Sanchez-Knutson,* 310 F.R.D. at 541. Even though the high volume of consumer complaints indicate that class members are very angry about First Data's unconscionable leases of the Equipment, and First Data has even sued some class members to collect the accelerated termination fee for these leases, it simply is not realistic for most consumers to file and prosecute individual lawsuits. Third, it does not appear that this case will present manageability problems beyond those typically encountered in the adjudication of a consumer class action. *Id.* at 541. This is especially the case because of the application of the New York choice of law provision in the

lease (for the reasons stated herein) to Plaintiff and Classes' claims against Defendant, as this Court will not have to concern itself with adjudicating variances in state law in determining the appropriateness of Rule 23 certification.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff, individually and on behalf of the proposed Class, requests that the Court enter an order granting Plaintiff's Motion for Class Certification, and provide all other and further relief that the Court deems equitable and just to conclude this matter.[9]

Dated: <u>November 30, 2016</u>              Respectfully Submitted,

By: <u>   /s/     John A. Yanchunis   </u>
    John A. Yanchunis (FL Bar No. 324681)
    Patrick Barthle
    **MORGAN & MORGAN** 201 N. Franklin St.
    7th Floor Tampa, FL 33602-5157 Phone:
    (813) 275-5272 Fax: (813) 275-9295
    Email: jyanchunis@forthepeople.com
            pbarthle@forthepeople.com

    Tiffany M. Yiatras (admitted *Pro Hac Vice*)
    **CONSUMER PROTECTION LEGAL, LLC**
    308 Hutchinson Road
    Ellisville, Missouri 63011-2029
    Tele: 314-541-0317
    Fax: 1 (855) 710-7706
    Email: tiffany@consumerprotectionlegal.com

    **ATTORNEYS   FOR   PLAINTIFF   AND   THE**
    **PROPOSED CLASSES**

---

[9]   Alternatively, Plaintiff requests that the Court grant certification under 23(c)(4). Plaintiff respectfully reserves the right to amend the class definitions prior to conclusion of this matter, subject to Court approval. *See* FRCP 23(c)(1)(C).