UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 17-CV-80949-Middlebrooks/Brannon

WILLIAM FOX, individually and
on behalf of all others similarly situated,

       Plaintiff,

v.

FIRST DATA MERCHANT SERVICES, LLC,

       Defendant.
_____/

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Defendant First Data Merchant Services, LLC ("First Data") submits this memorandum in opposition to Plaintiff's motion for class certification ("Motion") (DE 30).

## INTRODUCTION

First Data is a technology company that provides a variety of payment acceptance services and solutions to businesses through the thousands of independent sales channels which individually negotiate agreements with those merchants, as well as directly to the merchants. Merchants who sign up for First Data's payment processing services often lease the point of sale ("POS") equipment—in thousands of different types and configurations—used to accept and submit credit or debit card payments for processing.  First Data also offers merchants an equipment protection plan ("EPP") in the event they do not have their own insurance to cover the value of the leased POS equipment if it is stolen or destroyed.

Plaintiff William Fox, a business owner in Texas, seeks to certify a three-count, 50-state class action complaint alleging (1) breach of contract, (2) violation of New York General Business Law ("NY GBL") § 349, and (3) unjust enrichment.  Plaintiff brings these claims on behalf of a nationwide class of all merchants who paid First Data (a) a leasing fee for credit card processing equipment and/or (b) an EPP fee, which the Motion refers to as an "insurance" fee. Plaintiff also challenges the "termination" fee some merchants pay if they end their lease early, but he admits he did not pay such a fee and the proposed class does not seek to represent any merchants that paid a termination fee.  Further, although the Complaint invokes the laws of all 50 states, Plaintiff now contends "New York law is the governing law" for all of his claims.

Plaintiff alleges that: (1) he was induced to enter into a processing and leasing agreement by promises of savings that never materialized; (2) the person who sold him the processing services told him the lease was cancellable within 30 days, but he later discovered this was not true; (3) he was promised the "latest and greatest equipment" to process chip cards, but the equipment he received was "overpriced and substandard" because it could not accept a chip card immediately; (5) even after the equipment was programmed to accept chips, it would not accept all debit cards; (6) the leasing and EPP fees were not disclosed before he agreed to them; (7) the leasing fees are "excessive" and unconscionable; and (8) he was overcharged for a "sham insurance" EPP fee to which he never agreed.

Plaintiff's Motion fails for multiple, fundamental reasons.  As a threshold matter, Plaintiff's NY GBL § 349, contract and unjust enrichment counts cannot be certified because he

lacks standing under Rule 23 to raise these claims on behalf of the proposed class. Plaintiff has no standing to enforce NY GBL § 349 because: (1) the statute does not apply extraterritorially, and Plaintiff admits his business is in Texas and the negotiations and the agreements his business signed that give rise to his claim occurred in Texas and Oregon, and (2) this *consumer* statute plainly does not apply to the transaction at issue here, namely the leasing of card processing equipment used by Plaintiff's *business*. Plaintiff also lacks standing to raise his contract and unjust enrichment claims on behalf of the putative class. As First Data demonstrated in its Partial Motion to Dismiss Amended Complaint (DE 26; DE 28) and Plaintiff subsequently conceded in his deposition, the contract documents Plaintiff signed and initialed in multiple places show: (1) he executed the equipment lease agreement on behalf of his company Fox Marketing Co. as part of a "bundled" deal he negotiated with his credit card processing services agreement; (2) he knew and agreed to the amount of the monthly leasing fees; (3) the lease agreement repeatedly and prominently stated it is "non-cancellable for the full term"; (4) he acknowledged receiving, reading and understanding the terms and conditions of the equipment lease agreement; and (5) despite his concerns regarding the quality of the equipment and the amount of the lease fee, he "decided to stay with it for the four years of the lease" and continued making payments. In addition, Plaintiff concedes the terms of the EPP were fully disclosed, he agreed to pay the EPP fees, he does not dispute the amount of his EPP fees, and he never made a claim under the EPP.

Although Plaintiff's lack of standing by itself dooms his class claims, the Motion also should be denied because it fails to satisfy the requirements of Rule 23(a), (b)(2), (b)(3), and (c)(4), including:

- *A fatally flawed class definition*—which impermissibly sweeps in merchants whose claims fall outside the applicable statute of limitations, and merchants who agreed to arbitrate their disputes with First Data;

- Plaintiff's inability to bring claims for the EPP and lease termination fees, and other unique defenses First Data can assert against him (*e.g.*, voluntary payment doctrine), which renders him *an atypical and inadequate class representative*;

- *Numerous individualized questions of fact and law* regarding the alleged "material omissions and/or the promise of savings" which "induced Plaintiff and Classes into an unconscionable lease" (DE 30-1 at 1), that overwhelm Plaintiff's statutory, contract and unjust enrichment claims, defeat commonality and predominance, and make a class action of these claims unmanageable;

- The fact that *Plaintiff's request for monetary relief makes certification of a Rule*

2

***23(b)(2) class improper as a matter of law***; and

- Plaintiff ***cannot use Rule 23(c)(4) to certify individual issues as a means for achieving an end run*** around the (b)(3) predominance requirement.

**BACKGROUND**[1]

**I.    First Data Provides a Variety of Payment Acceptance Services Through Thousands of Independent Sales Channels Which Individually Negotiate Agreements With Merchants.**

First Data is a technology company that provides a variety of payment acceptance services and solutions to merchants through thousands of sales channels that support those merchants as well as directly to merchants themselves.  Ex. 1 (Quaranta Dec.) ¶ 4.  First Data enters into an agreement with each independent sales channel, which specifically provides that the sales channel acts as an independent contractor and has no authority to incur obligations or make representations on behalf of First Data.  *Id.* ¶ 14.  Most relationships between First Data and merchants are initiated and established by independent sales organizations ("ISOs") that are not affiliated with First Data.  *Id.* ¶ 13.

The ISOs independently establish the relationship with the merchant.  *Id.* ¶ 16.  They set the pricing, set up payment processing, provide much of the customer support, provide the training to merchants on how to submit transactions, and provide other services and offerings they may combine together with those presented on First Data systems.  *Id.*  Beyond establishing some parameters for the selling of First Data's services, First Data is not involved in the highly individualized negotiation between an independent sales channel and a merchant of the processing, leasing services, and other products the merchant may use and the prices it will pay.  Ex. 1 ¶ 20.  The sales channels negotiate these issues on a merchant-by-merchant basis.  *Id.*

First Data offers equipment leasing services to sales channels, *i.e.*, provides the sales channel with the option of offering prospective merchants the opportunity to lease the POS equipment.  *Id.* ¶ 24.  Each POS hardware type (make, model) has hundreds or even thousands of different permutations and options that can be used in conjunction with one another.  *Id.* ¶ 32.  The equipment that is leased to merchants is procured by the sales channel, which configures the POS equipment and loads it with software compatible with the services the sales channel is providing.  *Id.* ¶¶ 26-28.  Due to the configuration and set up requirements, the sales channels

---

[1] First Data offers the Declarations of Edward Quaranta (Ex. 1, "Quaranta Dec.") and Sheldon Philp (Ex. 2, "Philp Dec.") and the exhibits attached thereto in support of its opposition to the Motion.

provide nearly all POS equipment to merchants as part of the negotiation for the bundled processing/leasing relationship. *Id.* ¶ 29. A piece of POS hardware cannot be used unless it is specifically configured by the sales channel and set up to that merchant's processing needs. Ex. 1 ¶ 29. A merchant cannot simply take a POS device it obtained from a third party and use it with any processor. *Id.*

Depending on the hardware and services sold, some sales channels may charge more for processing services and less for equipment, while other sales channels may accept a smaller margin on processing services and seek to make more money on the individual sale or lease of equipment. *Id.* ¶ 33. Ultimately, the sales channel and merchant's negotiation takes into account the overall economics of the contemplated relationship. *Id.* The information a merchant receives before it signs a lease is highly individualized because the sales channels may use their own documentation to sell the services. *Id.* ¶ 34.

**II.    There Are Thousands of Different Types and Configurations of Leased POS Equipment and the Same Equipment May Be Leased at Different Prices Depending on a Variety of Factors, Including the Length of the Lease and the Value of the Processing Relationship.**

First Data has purchased hundreds of thousands of non-cancellable leases covering thousands of different types and configurations of POS equipment from thousands of different independent sales channels. Ex. 1 ¶¶ 32, 39. First Data acquires the leases based on many factors, such as the type of POS terminal leased, the duration of the lease, the value of the monthly payment for the lease, and the merchant's credit score. *Id.* ¶ 40. The cost of acquiring the lease varies widely and bears little or no relationship to the underlying cost of the POS equipment. *Id.* ¶¶ 41-42. For example, First Data purchased three (3) leases for the same device (a "VX520" terminal) for three different prices. *Id.* ¶ 42.

**III.    Plaintiff's Business, Fox Marketing Co., Signs a Processing and Leasing Agreement Based on His Individual Negotiations With a Sales Representative From Securus Payments, a Third-Party Sales Channel That Was an Independent Contractor for First Data.**

Plaintiff is the owner and principal of Fox Marketing Co. which is located in Abilene, Texas, and sells, refurbishes and repairs computers, as well as electronic cigarettes. Ex. 2-A (Fox Depo. Tr.) at 10, 13. In his business, Plaintiff accepted credit card payments and used credit card terminal equipment for over 25 years. *Id.* at 12-13.

Plaintiff received a cold call from Securus Payments, an ISO located in Portland, Oregon,

around December 2014 telling him that a new law required his business to accept chip credit cards, requiring that he update his POS terminal.  *Id.* at 34-35, 40.  Plaintiff met with a Securus sales representative named Chad, who reviewed the credit card statements from Fox Marketing's processor at the time, Flagship Merchant Services.  *Id.* at 56, 65.  Chad offered Fox Marketing a new deal that "bundled" processing fees with a $120 monthly leasing fee.  *Id.* at 41-42, 65-66; Ex. 2-C.  Chad presented a worksheet representing the new "bundled" charge would be less than what Fox Marketing was paying to Flagship.  *Id.*  Chad also said Fox Marketing would receive the "newest and greatest" equipment that would take the chip cards.  Ex. 2-A at 24.

After accepting the Securus offer, Plaintiff signed and initialed in multiple places lease documents disclosing prominently and repeatedly that the lease is non-cancellable.  *Id.* at 87-89, 134; Exs. 2-E, 2-G, 2-I.  But, Plaintiff claims he was deceived because Chad told him "if you return all the equipment, his exact words, within 30 days, it's cancelable."  Ex. 2-A at 25.  Plaintiff claims the POS equipment he received from Securus did not initially support chip cards.  *Id.* at 27, 47.  Plaintiff claims he called Securus and was told the software to take the chip cards would not be available for download for another several months.  *Id.*  Plaintiff states he called Securus within the 30-day window advised by Chad, but was told what Chad had stated to him about cancellation was "not correct."  *Id.* at 27, 50.

Once Fox Marketing received its first Securus bill, Plaintiff noticed the processing fees were less than it was paying with Flagship, but claims that the overall fees were not lower.  *Id.* at 25.  Nevertheless, Plaintiff "decided, we've signed a lease for four years, processing's decent, you know, $100 a month.  We'll just live with that.  At the end of four years we'll switch." *Id.* at 50; *see also id.* at 64 ("But with the lease not being cancelable, I just decided to stay with the processing through the terms of the lease and then cancel everything.").  Plaintiff conceded at his deposition he would not have been "misled" if the amount of Fox Marketing's combined processing, lease and EPP fees are less than what it was paying with Flagship.  *Id.* at 100.  First Data's records show the average monthly processing fees paid by Fox Marketing under the Securus contract was approximately $160 less than prior processor Flagship.  *See* Ex. 1 ¶ 22.

When the POS equipment was finally updated five months later, it worked on some, but not all, of the chip cards.  Ex. 2-A at 25, 27. Plaintiff called Dejavoo, the equipment manufacturer, but was told by Dejavoo that it no longer supported Securus customers.  *Id.* at 48.  Thus, for those cards where the chip did not work, Plaintiff came up with a work-around by

manually entering the information and then swiping the card.  *Id.* at 51.  This process, according to Plaintiff, was "a pain, versus in and out and they're gone."  *Id.*

Plaintiff also claims Chad from Securus deceived him because the retail price of the leased equipment was not disclosed.  But Plaintiff testified he knew from the beginning the make and model of the POS equipment he would lease, "that there would be a $120 fee per month to lease the equipment" and the price "was not a surprise" to him.  *Id.* at 59.  Plaintiff also testified he easily found the retail price of the POS equipment on the Internet.  *Id.* at 97-99 (stating he determined the price of the Dejavoo V8 terminal within a week of receiving it because it was posted online at "Buy It Now on Ebay").

**IV.   Plaintiff Elects to Participate in the Equipment Protection Program ("EPP") and Voluntarily Pays the Monthly EPP Fees.**

When Plaintiff entered into the processing and leasing agreement, he signed and initialed an acknowledgement form certifying that he received, read, and understood the Merchant Services Program Terms and Conditions ("Program Guide").  Ex. 2-A at 82, 84.  The Program Guide contains the lease agreement terms that explicitly state the Merchant "shall keep the Equipment adequately insured against loss by fire, theft, and all other hazards" and "shall provide proof of insurance as evidenced by a certificate naming First Data Merchant Services Corporation as a loss payee under [the Merchant's] insurance policy."   Ex. 2-F at FD1C-0127248.   These terms are also found in the stand-alone lease agreements other merchants execute.  Ex. 3-B.  Plaintiff further admits he received a letter from First Data advising he could "enroll in First Data's Equipment Protection Program [EPP] to satisfy the insurance requirement of [his] lease agreement." Ex. 2-A at 104, 106-107; Ex. 2-L at FD1C-0127202).   The letter prominently disclosed to Plaintiff in bolded letters "FDGL offers coverage for you starting as low as $4.95 a month, fixed for the term of your lease."  Ex. 2-L at FD1C-0127200.  Plaintiff enrolled in the EPP, agreed to pay the EPP fee and does not dispute the amount.  Ex. 2-A at 110-111, 129.  To date, Plaintiff continues to pay the EPP fee with his lease payment and has not made a claim under the EPP.  *Id.*

**ARGUMENT**

**PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF PROVING
THAT A CLASS SHOULD BE CERTIFIED**

"The class action is an exception to the usual rule that litigation is conducted by or on behalf of the individual named parties only."  *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 348

(2011).  To certify a class action, Plaintiff must have standing to bring each of the putative class'
claims, *Prado-Steiman v. Bush*, 221 F.3d 1266, 1267 (11th Cir. 2000), and must satisfy "the four
requirements listed in Rule 23(a), and the requirements listed in any of Rule 23(b)(1), (2), or
(3)."  *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015).  In addition, Plaintiff
"must propose an adequately defined class that satisfies the requirements of Rule 23."  *Ritchie v.
Mueller Servs.*, 2013 U.S. Dist. LEXIS 201156, at *6-7 (S.D. Fla. Apr. 18, 2013).

Plaintiff "has a burden of *proof*, not a burden of pleading" and "must affirmatively
demonstrate his compliance with Rule 23 by proving that the requirements are *in fact* satisfied."
*Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016).  There is no
"presumption in favor of certification."  DE 30-1 at 8.  Rather, "if doubts remain about whether
the standard is satisfied, the party with the burden of proof loses.  All else being equal, the
***presumption is against class certification*** because class actions are an exception to our
constitutional tradition of individual litigation."  *Brown,* 817 F.3d at 1233 (emphasis added).

The "district court must conduct a 'rigorous analysis' to determine whether the movant
carried his burden, which will frequently entail overlap with the merits of the plaintiff's
underlying claim."  *Id.* at 1234.  While "the district court can consider the merits only to the
extent they are relevant to determining whether the Rule 23 prerequisites for class certification
are satisfied[,] if a question of fact or law *is* relevant to that determination, then the district court
has a duty to actually decide it and not accept it as true or construe it in anyone's favor."  *Id.*
Plaintiff's Motion falls well short of satisfying these standards.

## I.   PLAINTIFF LACKS STANDING TO RAISE ANY OF THE CLASS CLAIMS.

"It is well-settled in the Eleventh Circuit that prior to the certification of a class, and
before undertaking any of the analysis under Rule 23, the district court must determine that [the]
named class representative has Article III standing to raise each class claim."  *Alhassid v. Bank
of Am., N.A.*, 307 F.R.D. 684, 692 (S.D. Fla. 2015).  A "plaintiff cannot represent a class unless
he has standing to raise the claims of the class he seeks."  *Holliday v. Albion Labs., Inc.*, 2015
U.S. Dist. LEXIS 178148, at *8-9 (S.D. Fla. June 9, 2015).  The Court should deny class
certification because Plaintiff lacks standing to bring his claims on behalf of the putative class.

### A.   Plaintiff Lacks Standing to Enforce New York GBL § 349.

#### 1.   First Data's Alleged Deceptive Conduct Did Not Occur in New York.

"To qualify as a prohibited act under [GBL § 349], *the deception of a consumer* must

occur in New York." *Springer v. United States Bank Nat'l Ass'n*, 2015 U.S. Dist. LEXIS 171734, at *33 (S.D.N.Y. Dec. 23, 2015); *Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314, 325 (N.Y. 2002) (same). As *Goshen* explained, applying "the statute to out-of-state transactions in the case before us would lead to an unwarranted expansive reading of [§ 349], contrary to legislative intent, and potentially leading to the nationwide, if not global application of General Business Law § 349" and "would tread on the ability of other states to regulate their own markets and enforce their own consumer protection laws." *Id.*

Here, Plaintiff has no standing to enforce GBL § 349 because he admittedly "entered into a lease with First Data through his business" Fox Marketing Co. (DE 30-1 at 14 n.6), rather than in his own name.[2] Moreover, Fox Marketing Co. could not bring an action under GBL § 349 because, as Plaintiff testified, the negotiations and alleged misrepresentations by Securus that gave rise to this claim occurred in Texas, where Fox Marketing Co. is located, and Oregon, where Securus is located. *See Springer*, 2015 U.S. Dist. LEXIS 171734, at *33-34 (dismissing GBL claim where alleged deceptive conduct occurred in Nevada); *see also Goshen*, 98 N.Y.2d at 322 (affirming dismissal of GBL claim because plaintiffs purchased insurance policy in Florida).

### 2. First Data's Alleged Deceptive Conduct Was Not Directed at Consumers.

Even if a proper New York putative class representative were obtained, he could not bring a GBL § 349 claim because the GBL is a *consumer*-oriented statute and the leases at issue were entered into with merchants for use in their *businesses*. "To make out a prima facie case under Section 349, a plaintiff must demonstrate that (1) defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). A business is not a consumer for the purposes of GBL § 349. *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 303 (E.D.N.Y. 2010) ("Subsequent appellate authority, however, excludes businesses from the definition of 'consumer,' stating unequivocally that a consumer is an individual who purchases goods and services for personal, family or household use."). Further, as the court

---

[2] The fact that Plaintiff is a personal guarantor of the contract does not change this conclusion. *See L & F Homes & Dev., L.L.C. v. City of Gulfport*, 538 F. App'x 395, 408 (5th Cir. 2013) (holding a "stockholder in a corporation does not have standing to bring suit in his own name for injuries sustained by the corporation ... even [if] that individual is the sole shareholder" and the "alleged economic injury [arose] from his personal guarantee of a loan to [his company]"); *Infanti v. Scharpf*, 2012 U.S. Dist. LEXIS 19165, at *14 (E.D.N.Y. Feb. 14, 2012) (personal loan guarantee did not create standing to bring claim for losses to corporation).

explained in *Spirit Locker*, which also involved a suit between a merchant and a credit card processor, where the alleged conduct targeted only businesses, and had no direct impact on consumers, a business cannot bring a § 349 claim.  *Id.* at 303-04.

Here, Plaintiff has no standing to enforce NY GBL § 349 because First Data's card processing and equipment leasing services are, by their very nature, business products and the alleged deceptive conduct targeted only businesses.  *See id.* (holding plaintiff "fails to meet the threshold requirement of consumer orientation, because [defendant] is alleged in the complaint only to have misled other business entities concerning the ETF"); *Citipostal, Inc. v. Unistar Leasing*, 724 N.Y.S.2d 555, 558 (N.Y. App. Div. 2001) ("The acts complained of are limited to business rather than consumer leases, and the conduct complained of cannot carry over to consumer transactions[.]"); *see also Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 266 (S.D.N.Y. 2011) ("Defendants' marketing of a welfare benefit plan specifically designed for the purpose of financing businesses' insurance costs for their employees" was, by its very nature, "not a product for 'personal, family or household use' and the deceptive conduct alleged by Plaintiffs was not directed at non-business consumers.").

### 3.   First Data's Alleged Deceptive Conduct Is Not Prohibited By the GBL.

Plaintiff also lacks standing to bring claims under the GBL because the alleged conduct he complains about—the lease fee is "excessive" and First Data does not inform merchants the leased equipment is available from third parties at a lesser price—is not proscribed by the statute.

The GBL's "focus is whether the amount of the charge is disclosed.  If so, the question of whether the amount charged is unreasonable or excessive is not an issue for the courts to address."  *Zuckerman v. BMG Direct Mktg.*, 737 N.Y.S.2d 14, 15-16 (N.Y. App. Div. 2002) (holding "inflated" fees that exceeded the defendant's actual costs were not deceptive under the GBL where fees were disclosed: "As a matter of law, a disclosure that a specified amount will be charged for shipping and handling cannot cause a reasonable consumer to believe that such amount necessarily is equal to or less than the seller's actual shipping and handling costs.").

"It follows that a merchant need not 'disclose' to each potential buyer with whom it may negotiate that the buyer might be able to negotiate a deeper discount under some other payment scenario.  The GBL simply does not require a merchant to disclose to a customer that he or she could pay less under a different arrangement."  *Canestaro v. Raymour & Flanigan Furniture Co.*, 984 N.Y.S.2d 630, 630 (N.Y. Sup. Ct. 2013) (citing *Gershon v. Hertz Corp.*, 626 N.Y.S.2d

80 (N.Y. App. Div. 1995) ("[d]efendant's alleged practice of not disclosing to prospective customers alternative rental arrangements at lower rates than that the customer had inquired about is not a deceptive practice under General Business Law § 349")).

This is especially true here, where the retail price of the hardware is readily accessible to merchants before they sign the lease agreement, as Plaintiff testified. Ex. 2-A at 97-98. Indeed, New York courts regularly dismiss GBL claims where allegedly omitted information was not within the exclusive possession of the defendant, reasoning "that in a case involving omissions, the statute surely does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation." *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 530 (S.D.N.Y. 2003) (dismissing GBL claim where plaintiffs failed to allege the omitted information "was solely within McDonalds' possession or that a consumer could not reasonably obtain such information").

**B.    Plaintiff Lacks Standing to Bring a Breach of Contract Claim.**

As discussed in greater detail in First Data's Partial Motion to Dismiss Amended Complaint (DE 26; DE 28), Plaintiff cannot bring the alleged breach of contract claims because not only do the contract documents he signed and initialed in multiple places fully disclose the allegedly omitted leasing and EPP information, but also Plaintiff continued to make payments. *See* DE 26 at 5-6; DE 28 at 4. Indeed, Plaintiff conceded these issues at his deposition. *See* Ex. 2-A at 25, 110-111, 129. Plaintiff also lacks standing to bring these alleged contract claims because "unconscionability" is not a recognized cause of action under New York law (DE 28 at 5-6) and an implied covenant of good faith and fair dealing claim cannot stand if it is duplicative of a breach of contract claim or if there is no breach of an actual contract provision (*id.* at 7-8).

**C.    Plaintiff Lacks Standing to Bring an Unjust Enrichment Claim.**

Plaintiff cannot bring the alleged unjust enrichment claim because (1) it is duplicative of the contract and GBL claims, and (2) he fails to establish any facts requiring restitution. New York law "requires dismissal of unjust enrichment claims that duplicate not only contract, but also tort claims." *Rodriguez v. Cheesecake Factory Inc.*, 2017 U.S. Dist. LEXIS 213746, at *16-17 (E.D.N.Y. Aug. 11, 2017). It "would not be against equity and good conscience" to allow First Data to retain the lease and EPP fees Plaintiff paid because, as shown above, he "had access to all the relevant information" when he made the payments. *Id.* (dismissing unjust enrichment claim, "declin[ing] to relieve plaintiff of the consequences of his own failure to exercise

reasonable caution with respect to a business transaction").

In short, because Plaintiff cannot individually bring the alleged claims, he cannot assert them on behalf of the class. *See, e.g.*, *City of Hialeah v. Rojas*, 311 F.3d 1096, 1104 (11th Cir. 2002) (reversing certification because named plaintiffs lacked standing). The Court need go no further. *Id.* (finding no need to address the procedural requirements of Rule 23).

## II.     PLAINTIFF HAS NOT SHOWN THERE IS A VIABLE CLASS.

Before even reaching the Rule 23 requirements, Plaintiff "must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2015) (internal quotations omitted). Plaintiff's proposed class cannot meet this threshold requirement.

### A.     The Proposed Class Lacks the Precision Required by Rule 23.

Plaintiff seeks to certify a nationwide class defined as:

> All persons and entities in the United States who paid First Data (a) a lease fee for credit card processing equipment and/or (b) an insurance LDW fee.

DE 19 ¶ 40.  Plaintiff also seeks to certify a Texas class defined as:

> All persons and entities in Texas who paid First Data (a) a lease fee for credit card processing equipment and/or (b) an insurance LDW fee.

*Id.* at ¶ 41.  Plaintiff's proposed class is not adequately defined because it is limitless in time, including merchants with claims barred by the applicable statutes of limitations. *See Oginski v. Paragon Props. of Costa Rica, LLC*, 282 F.R.D. 672, 677-8 (S.D. Fla. 2012) ("[F]ailure to limit the proposed class to those whose claims come within the applicable statute of limitations places the burden on the factfinder to determine, on an individualized basis, whether Defendants have valid statute of limitations affirmative defenses."); *Torrent v. Ollivier*, 2016 U.S. Dist. LEXIS 132629, at *6 n.3 (C.D. Cal. Sept. 27, 2016) (finding class that included members whose claims fell "outside the applicable statute of limitations" was not viable).

### B.     The Proposed Class Impermissibly Includes Members Who Have No Cause of Action Under NY GBL § 349.

"A class must be defined in such a way that every member of the putative class would have standing to assert the relevant claims." *Justice v. Rheem*, 318 F.R.D. 687, 694 (S.D. Fla. 2016).  "When the proposed class includes many members without claims, the court may deny certification." *Id.*  Here, the proposed class is overbroad because it includes numerous merchants who, like Plaintiff, entered into agreements outside of New York and therefore do not have a

cognizable claim under NY GBL, which is expressly limited to New York transactions. *See Varnes v. Home Depot USA, Inc.*, 2015 U.S. Dist. LEXIS 118592, at *9 n.11 (M.D. Fla. Sept. 4, 2015) (stating that including class members without a viable claim "is fatal to class certification" and "declin[ing] to redefine the class definition in attempt to remedy its facial inadequacies"); *see also Kaufman v. Sirius XM Radio, Inc.*, 751 F. Supp. 2d 681, 688 (S.D.N.Y. 2010) ("Plaintiffs have not alleged sufficient facts from which [the court] could reasonably deduce that Kaufman (or any similarly-situated non-New York residents) was deceived in New York.").[3]

  **C. The Proposed Class Improperly Includes Members Who Agreed to Arbitrate.**

  As shown above, merchants receive differing leasing documents depending on the sales channel involved in the negotiation.  A number of leasing agreements specifically require the parties to submit disputes to individual arbitration.  Ex. 1 ¶ 36.  However, Plaintiff has "made no effort to separate out those putative class members who may very well be barred from pursing [sic] class claims due to the existence of valid arbitration agreements or class action waivers that potentially prohibit such litigation." *Hill v. T-Mobile USA, Inc.*, 2011 U.S. Dist. LEXIS 157669, at *16 (N.D. Ala. May 16, 2011).  Indeed, allowing Plaintiff to represent merchants who agreed to arbitrate their disputes with First Data "would render the[ir] arbitration clauses totally useless, in contravention of the FAA." *King v. Capital One Bank (USA), N.A.*, 2012 U.S. Dist. LEXIS 163562, at *43 (W.D. Va. Nov. 15, 2012).

**III. PLAINTIFF HAS NOT ESTABLISHED THE REQUIREMENTS OF RULE 23(a).**

  Plaintiff's failure to provide an adequately defined class "obviates the Court's need to engage in the Rule 23(a) four-part analysis." *Alhassid*, 307 F.R.D. at 696.  Nevertheless, class

---

[3] Although the Complaint invokes the statutes of all 50 states (DE 19 at ¶ 85), Plaintiff now contends "New York law is the governing law" for all of his claims (DE 30-1 at 7), and states "this Court will not have to concern itself with adjudicating variances in state law in determining the appropriateness of Rule 23 certification." *Id.* at 20.  Thus, as Plaintiff concedes, a class cannot be certified if the putative class members' claims are governed by the deceptive practices statutes of many different states, which is the case here. *See Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 229 (S.D. Fla. 2002) (finding no predominance given the substantial variation in the deceptive trade practices laws of various states); *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 947 (6th Cir. 2011) ("[I]in view of plaintiffs' appropriate concession that the consumer-protection laws of the affected States vary in material ways, no common legal issues favor a class-action approach to resolving this dispute."); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985) (Due process demands that a court "may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a common issue of law.").

certification is also improper because Plaintiff has not met all of the Rule 23(a) prerequisites.

>    **A.    Plaintiff's Claims Are Not Typical of the Proposed Class.**

Typicality requires Plaintiff to demonstrate that a "sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Id.* at 697. Plaintiff's typicality argument is a mere conclusory statement that "both he and the proposed Classes were subject to Defendant's common course of conduct as described herein" and "by pursuing his own claims, Plaintiff will necessarily advance the class members' interests." DE 30-1 at 11. But Plaintiff cannot even pursue his own claims individually and "there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class." *Prado-Steiman*, 221 F.3d at 1279.

Plaintiff's typicality argument also fails because he is subject to unique defenses that could potentially become the focus of the litigation. For instance, Plaintiff admits he had full knowledge of the leasing and EPP fees' alleged "excessiveness," yet he continued to timely pay them. Ex. 2-A at 25, 50, 110-11. Therefore, the voluntary payment doctrine, which bars recovery of payments "made with full knowledge of the facts," precludes Plaintiff's claims. *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 740 N.Y.S.2d 396, 397 (N.Y. App. Div. 2002) (doctrine barred recovery of alleged "excessive" late fees); *see Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 U.S. Dist. LEXIS 3962, at *14 (S.D. Fla. Jan. 10, 2013) (Plaintiff's "knowledge, awareness and voluntary payment after consulting with legal counsel is atypical of the class and subjects him to defenses not applicable to others."); *see also Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 63 (S.D.N.Y. 2006).[4]

>    **B.    There Are No Common Issues That Will Resolve the Litigation as a Whole.**

As Plaintiff concedes, commonality requires proof the Court can "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "What matters to class certification is not the raising of common 'questions'—even in droves— but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.*; *Brown*, 817 F.3d at 1238.

---

[4] Additionally, Plaintiff's claims are not typical of those merchants who are subject to arbitration provisions that foreclose their ability to proceed in this action. *See Renton v. Kaiser Found. Health Plan*, 2001 U.S. Dist. LEXIS 20015, at *15-16 (W.D. Wash. Sept. 24, 2001) (finding no typicality in part due to class members' varying contractual provisions requiring arbitration).

Here, Plaintiff claims he "easily meets" the commonality requirement because the "claims of Plaintiff and the putative class members are based on the common contention that Defendant First Data, itself and through its ISOs, through material omissions and/or the promise of savings, induced Plaintiff and Classes into an unconscionable lease," then "overcharged them for sham insurance that they never agree to when the originally entered into the lease with First Data," and "put into the unconscionable lease an accelerated remaining payment termination fee if Plaintiff or class member [sic] ever decided to get out of the lease." DE 30-1 at 10-11.

Plaintiff's "common contentions" merely summarize the claims in his complaint. "[A]s stated clearly by the *Wal-Mart* Court, the fact that class members suffered violations of the same provisions of law does not satisfy the commonality requirement. Additionally relevant are the potential factual distinctions and differing injuries amongst class members." *Ritchie*, 2013 U.S. Dist. LEXIS 201156, at *14-15 (denying certification, "find[ing] that commonality fails").

Here, the issues that are allegedly common are ***not*** susceptible to class-wide proof. Rather, they require the examination of hundreds of thousands of transactions that were individually negotiated by thousands of independent sales channels using their own varying (written and oral) sales procedures. *See* Ex. 1 (Quaranta Dec.) ¶¶ 4, 13, 33, 37, 39. For instance, resolution of these claims will require individualized examination of:

- the oral and written representations made to the hundreds of thousands of merchants during the sales process to determine what (if any) savings were promised (*id.*);

- the merchants' actual processing and leasing costs to determine whether each of them actually realized the promised savings;

- the oral representations provided to the hundreds of thousands of merchants that entered into the non-cancellable leases to determine whether they were told by their sales channels the leases were actually cancellable in "the first 30 days" (*id.* ¶ 39);

- whether each of these merchants were told the retail price of each piece of hardware associated with the hundreds of thousands of leased devices at issue;

- whether each of these merchants knew or had access to information revealing the retail price of the hardware associated with the hundreds of different types of leased POS equipment (*id.* ¶ 32);

- whether the hundreds of thousands of merchants charged EPP fees knew of and agreed to the EPP (*id.* ¶¶ 48-50);

- whether each of these merchants made a claim (or did not make a claim) under the EPP; and

- whether the thousands of merchants that submitted claims or otherwise benefitted

from the EPP were satisfied.  *Id.*

Only through such individualized inquiries can it be determined whether each (or any) of the hundreds of thousands of merchants were "deceived" by alleged promises about cancellability and alleged omissions about hardware prices, received any "promised" savings, or were "overcharged" for "sham insurance."

The extensive analysis necessary to evaluate Plaintiff's case illustrates this point. Plaintiff admits the Securus written documents prominently and repeatedly disclose the lease is non-cancellable for the full term indicated.  Ex. 2-A (Fox Depo. Tr.) at 88-89, 134; Exs. 2-F at FD1C-0127248, 2-G, 2-I.   However, Plaintiff claims he was deceived about that non-cancellability because Chad from Securus *orally* assured him "if you return all the equipment, his exact words, within 30 days, it's cancelable."  Ex. 2-A at 25.  Plaintiff also claims he was deceived because Chad failed to disclose the retail price of the Dejavoo terminal Fox Marketing was going to lease.  But Plaintiff readily admits (1) the Securus documents disclosed the monthly leasing fee in several places (*id.* at 59, 69-70, 73-74, 86; Exs. 2-C, 2-D, 2-E at 2, 2-H, 2-I, 2-J); (2) Chad told him from the beginning the make and model of the POS equipment Fox Marketing would be leasing (Ex. 2-A at 59); (3) he also "understood from the very beginning that there would be $120 fee per month to lease the equipment" and so the leased price "was not a surprise" to him (*id.*); and (4) he was easily able to find the retail price of the hardware being leased on the Internet.  *Id.* at 97-98.  Plaintiff further claims Securus promised the "latest and greatest equipment that would process chip cards" but the software programmed into the Dejavoo he received did not initially support them.  *Id.* at 27, 47.

With respect to cost savings, Plaintiff claims the written savings estimate provided by Securus misled him into signing the lease agreement.  As mentioned above, Chad presented him with a worksheet containing an individualized rate analysis representing Fox Marketing's savings if it switched from current processor Flagship to an equipment lease and processing service "bundle" from Securus.  *Id.* at 24, 41-42, 56, 65-66; Ex. 2-C.  Although Plaintiff admits Securus monthly processing fees are cheaper than Flagship, he believes total monthly costs are higher after adding the lease and EPP fees.  Ex. 2-A at 100.  Plaintiff concedes that if the amount of Fox Marketing's "bundled" processing, lease and EPP fees is less than what it was paying with Flagship, then Plaintiff's contentions of being misled are wrong.  *Id.*  Notably, First Data's records show the average monthly fees paid by Fox Marketing under the Securus contract

including the leasing and EPP fees are *less* than its prior processor Flagship.  Ex. 1 ¶ 22.

Finally, Plaintiff admits, contrary to allegations in the Amended Complaint, he affirmatively enrolled Fox Marketing in the EPP program, the EPP fees being charged are correct (and what he agreed to) and he never tried to make a claim under the EPP.  Ex. 2-A at 110-11, 129.  Notably, the record shows thousands of merchants elected to participate in the EPP and also submitted claims to replace equipment that First Data satisfied.  Ex. 1 ¶¶ 49-50.[5]

Therefore, an analysis of Plaintiff's claims establishes members of the putative class could not have been subject to the same "course of conduct" (DE 30-1 at 11) as Plaintiff (or Fox Marketing).  Instead, much like Plaintiff, each of the thousands of sales channels negotiated individually with each of these merchants, arriving at varying terms and prices for the thousands of different types and combinations of POS equipment based on a variety of factors.  Ex. 1 ¶ 20.  Like Plaintiff, each of the putative class members' negotiations would have to be reviewed individually to determine whether or not they have viable claims for violation of the unfair and deceptive practices statutes, breach of contract or unjust enrichment.

Plaintiff's contention that First Data exercises control over the ISOs via the training materials used during the sales process is unsupported and wrong.  DE 30-1 at 4-5.  While First Data may provide training and policy manuals, First Data does not control the sales process executed by sales channels in the field.  Ex. 1 ¶¶ 14, 20;  *see, e.g.*, *O'Neill*, 243 F.R.D. at 477-78 (finding that, even where defendant's employees were all given the same written policy, deceptive practices claim lacked commonality because some employees may have violated policy or communicated different information regarding damage waiver).  These thousands of independent sales channels have their respective strategies and processes for presenting, negotiating and entering agreements.  Plaintiff cannot simply assume his alleged facts are identical to the hundreds of thousands of other merchants who entered into agreements through those other sales channels.  Indeed, even Fox Marketing's sales channel Securus presented Plaintiff with additional Securus-created documents for him to execute, including a Merchant Acknowledgment Agreement regarding the processing and lease agreements not provided to First Data (Ex. 2-J), and, according to Plaintiff, made oral promises contradicting the express

---

[5] *See O'Neill v. Home Depot U.S.A., Inc.*, 243 F.R.D. 469 (S.D. Fla. 2006) (certification denied where the class "include[d] individuals who may have purchased a damage waiver, and following damage to the rented equipment, were not required to pay for repairs they otherwise may have been responsible for.").

terms of the lease.

## IV. PLAINTIFF CANNOT MEET RULE 23(B)(3) BECAUSE INDIVIDUAL ISSUES PREDOMINATE AND A CLASS ACTION IS NOT A SUPERIOR REMEDY.

"Rule 23(b)(3)'s predominance requirement is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Predominance requires "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000).  Because Plaintiff fails the lower threshold of commonality, he "obviously must fail the predominance test as well." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009).

### A. Plaintiff's NY GBL § 349 Claim Is Overwhelmed by Individual Issues.

The need for individualized determinations, as detailed above, compels the conclusion that common facts do not predominate Plaintiff's GBL § 349 claim.  For instance, Plaintiff claims First Data "makes no mention of the disproportionate cost of the lease as compared with the value of the underlying Equipment, but instead stresses deceptively the savings that First Data would provide to Plaintiff and the Class." DE 30-1 at 16.  Plaintiff argues this "material omission is subject to 'generalized proof' because it is omitted from [the contract documents]." *Id.*  However, this is not the case, as even Plaintiff admits his allegations of omission and false "cost savings" are based on an individualized worksheet created and presented to Plaintiff by Chad, a single sales representative from a single sales channel, and Plaintiff's individualized discussions with Chad.  Indeed, no such "class-wide" proof can exist on an omission claim of this nature.  Rather, proof of such class members' claims would require, at the very least, an individualized examination of hundreds of thousands of negotiations and executed transactions to determine what was promised to each merchant (both orally and in writing), compared with the merchant's actual experience.  Under these circumstances, common issues plainly do not predominate over individual ones.  *See Marino v. Home Depot*, 245 F.R.D. 729, 737 (S.D. Fla. 2007) ("[T]he need for individualized determinations as to the existence of a deceptive act leads to the conclusion that common facts do not predominate as to Plaintiff's [deceptive practices act] claim."); *O'Neill*, 243 F.R.D. at 478, 482 ("No single set of operative facts" determined liability and plaintiff's "highly individualized" claim "require[d] numerous individual verbal accounts as to what occurred and the conversations that took place [when the] equipment was rented."); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 13887, at *43 (D.N.J.

Feb. 6, 2012) (finding no predominance because resolution of NY GBL § 349 claims "will require numerous individualized inquiries").

    **B.  Plaintiff's Unjust Enrichment Claim Is Similarly Swamped by Individual Issues.**

The Eleventh Circuit has held that "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Kunzelmann*, 2013 U.S. Dist. LEXIS 3962, at *18-19 (explaining a claim for unjust enrichment or breach of the implied covenant of good faith and fair dealing "requires examination of the particular circumstances of an individual case as well as the expectations of the parties to determine whether an inequity would result or whether their reasonable expectations were met").

The same holds true here.  Whether First Data may equitably retain monthly lease or EPP fees paid by any particular merchant depends on several individualized inquiries that render class certification inappropriate.  For the lease fees, such inquiries include reviewing the disclosures made by the particular sales channels to each merchant about the leased equipment, when or how the merchant agreed to and/or voluntarily pay the lease fee and determining if the merchant experienced any promised savings.  *See Kunzelmann*, 2013 U.S. Dist. LEXIS 3962 at *27 (denying certification of unjust enrichment claim "because of the fact-specific nature of the inquiry required").  Similarly, for the EPP fee, the Court would have to make individualized inquiries, *e.g.*, whether a merchant knew of the fee, voluntarily enrolled and agreed to pay the fee, whether the merchant made a claim under the program, and if so, whether the claim was honored.  Such determinations are not susceptible to class-wide proof.  *See id.*; *In re Nationsrent Rental Fee Litig.*, 2009 U.S. Dist. LEXIS 23662, at *29-30 (S.D. Fla. Feb. 23, 2009) (finding no predominance, denying certification because "whether certain customers did actually receive some benefit from the [loss damage] waiver is one which must be determined on an individualized basis").[6]

    **C.   Plaintiff's Remaining Claims Are Overwhelmed By Individualized Issues.**

Plaintiff's predominance argument for his remaining claims rests on the blanket assertion that "because First Data uses substantially similar forms with form language," these claims  are susceptible to "generalized proof" and, therefore, meet the "predominance requirement of

---

[6] As noted, thousands of enrolled merchants made claims covered under the EPP to have their POS equipment replaced. *See* Ex. 1 ¶ 50.  Thus, it would not be "unjust" for First Data to retain these fees.

23(b)(3)."  DE 30-1 at 18.   However, Plaintiff's case illustrates his claims are inextricably intertwined with numerous extra-contractual oral representations.   In addition, Plaintiff cannot possibly dispute, as established above, that, while using forms, the individual negotiations between the sales channels and the merchants do necessitate a detailed individualized inquiry into every one of these transactions to determine whether or not any particular claim or defense exists.   Further, the undisputed record reflects forms used by the different sales channels with the putative merchant class members do contain material differences (Ex. 1 ¶¶ 34-36), all of which will require "numerous individual inquiries [] to determine whether a breach of the contract could be found."  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98 (S.D.N.Y. 2010) (noting "courts have denied certification even in cases that involved form contracts").[7]

Finally, while the presence of individualized damages issues does not necessarily prevent a finding of predominance, when, as here, "they are accompanied by significant individualized questions going to liability" the need to assess damages individually precludes certification. *Brown*, 817 F.3d at 1240.  Plaintiff does not even attempt to address this issue.

### D.    A Class Action Is Not a Superior Method of Resolving Plaintiff's Claims.

Trial of a class action in this case would be patently unmanageable because the individualized factual and legal issues absolutely predominates any possible common ones.  *See O'Neill*, 243 F.R.D. at 482 ("Because of the difficulties to be encountered in the management of a class action ... that presents the foregoing myriad individualized factual and legal issues, a class action is not the superior method for resolving the claims presented").

Plaintiff's superiority argument ignores the presence of all of these individualized issues, and instead rests on the conclusory assertion that "it does not appear that this case will present manageability problems beyond those typically encountered in the adjudication of a consumer class action."  DE 30-1 at 19.  Plaintiff also argues certification is necessary to permit plaintiffs to pool claims which would be uneconomical to litigate individually.   *Id.*   However, the economic incentive of pooling claims is not enough to grant certification.  Courts routinely deny certification where, as here, the purported class cannot meet the other (b)(3) requirements.  *See*,

---

[7] The "varying impact that class action waivers, agreements to arbitrate, and challenges to such provisions' contractual enforceability as a matter of state law" only compounds these already severe predominance problems.  *Hill*, 2011 U.S. Dist. LEXIS 157669, at *60.  Further, as noted above, depending on the particular merchant and transaction, the negotiations and subsequent deal documents may also include other documents (like with Fox Marketing) created by that particular sales channel.

*e.g.*, *Marino*, 245 F.R.D. at 737 (class action not superior; putative class members would not be deterred from prosecuting claims for nominal damages because deceptive practices statute provides for attorney's fees to prevailing party).  Accordingly, Plaintiff's conclusory statement that a class action is the most "superior" way to resolve this claim is not supportable.

## V.   PLAINTIFF HAS NOT ESTABLISHED RULE 23(b)(2)'s REQUIREMENTS.

Certification under Rule 23(b)(2) is appropriate only if the predominant relief sought is injunctive or declaratory.  *See Wal-Mart*, 564 U.S. at 360 (stating monetary relief must be merely "incidental" to injunctive or declaratory relief).[8]  "Monetary damages are incidental when class members automatically would be entitled to them once liability to the class as a whole is established, and awarding them should not entail complex individualized determinations." *Seaberg v. Atlas Roofing Corp.*, 321 F.R.D. 430, 448 (N.D. Ga. 2017).  Here, Plaintiff's claim for monetary relief is not "incidental" to the requested declaratory or injunctive relief.  *See Wal-Mart*, 564 U.S. at 360.  In fact, Plaintiff's action is plainly centered on recovering monetary relief.  *See* DE 30-1 at 12 (asserting Plaintiff "has shown through [his] conduct to date that [he] is motivated to obtain monetary relief for all class members").  In addition, putative class members' "damages calculation will be individualized" as they will wholly depend upon the individualized transaction entered by each class member.  *Seaberg*, 321 F.R.D. at 448; *Torrent v. Yakult U.S.A., Inc.*, 2016 U.S. Dist. LEXIS 130700, at *15 (C.D. Cal. Jan. 5, 2016) (holding (b)(2) prohibits certification when "individual calculations of monetary relief" are required).  Thus, Plaintiff's claims cannot be certified under Rule 23(b)(2).

## VI.   PLAINTIFF HAS NOT ESTABLISHED RULE 23(c)(4)'s REQUIREMENTS.

Plaintiff relegates his request to certify an unidentified issue under Rule 23(c)(4) to a single unsupported sentence for alternate "relief" located in a footnote.  DE 30-1 at 20 n.9.  Obviously, such a conclusory assertion is insufficient and must be rejected.  Moreover, courts "have emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement."  *O'Neill*, 243 F.R.D. at 481.  As in *O'Neill*, Plaintiff cannot "manufacture predominance" and certification of an issue class is inappropriate.  *Id.* at 481-82; *see also Seaberg*, 321 F.R.D. at 447 (agreeing that "a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever common issues for a class trial").

---

[8] Plaintiff ignores this, relying instead on two cases decided before *Wal-Mart*.  DE 30-1 at 13.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, as well as those in First Data's Partial Motion to Dismiss (D.E. 26; D.E. 28), Plaintiff's motion for class certification should be denied.

Dated:  January  16 , 2017                    Respectfully submitted,

                                            WHITE & CASE LLP
                                            Southeast Financial Center
                                            200 South Biscayne Boulevard, Suite 4900
                                            Miami, Florida 33131-2352
                                            Telephone: (305) 371-2700
                                            Facsimile: (305) 358-5744

                                            By:   *s/ Jaime A. Bianchi*
                                                      Jaime A. Bianchi
                                                      Florida Bar No. 908533
                                                      jbianchi@whitecase.com

                                                      James N. Robinson
                                                      Florida Bar No. 0608858
                                                      jrobinson@whitecase.com

                                                      Sheldon A. Philp
                                                      Florida Bar No. 020123
                                                      sphilp@whitecase.com

                                            *Counsel for Defendant*
                                            *First Data Merchant Services, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on January   16  , 2017, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

                                            By:   *s/ Sheldon A. Philp*
                                                      Sheldon A. Philp